Moore v. Caldwell.


# WILLS—EVIDENCE—TRIAL.

[Huron (6th) Circuit, October Term, 1904.]

Parker, Hull and Haynes, JJ.

WILLIAM E. MOORE ET AL. V. WILLIAM CALDWELL ET AL.

1. TESTATOR MUST HAVE SUFFICIENT MENTAL CAPACITY TO REMEMBER PROPERTY, ETC.

A person desiring to make a will must have sufficient mental capacity to remember his property and the proper objects of his bounty, and, without suggestion, to make a testamentary disposition of it; but it is not necessary that he be as strong in mind and body as he ever was, or to have that strength of mind as is required in making a contract.

2. DELUSION OF TESTATOR MUST BE AN INSANE DELUSION TO AFFECT WILL.

A delusion of testator does not constitute mental incapacity unless it is an insane delusion.

3. EXPERT AND LAY TESTIMONY MUST BE CONSIDERED IN DECIDING TESTATOR'S CAPACITY.

In determining whether or not testator was of sound mind, or was suffer-ing from an insane delusion which influenced him in making and signing a paper alleged to be his will, all the testimony offered on the subject of his mental capacity, both by plaintiff and defendant, must be considered; and in considering the evidence, the testimony of experts should be considered by the jury as any other testimony; and although defendants had no experts, it cannot be said, as matter of law, that the testimony of plaintiff's experts who never saw testator should outweigh absolutely the testimony of lay witnesses called by defendant who knew testator for several years, and some of whom had business transactions with him, and saw and talked with him every day.

4. DECLARATION OF ONE BENEFICIARY NOT BINDING ON OTHERS OR ADMISSIBLE.

Declarations of one of several beneficiaries under a will as to testator's unsoundness of mind, etc., are not binding on the other beneficiaries, and are inadmissible against them in a will contest.

5. JURY, AND NOT EXPERTS, TO DECIDE TESTATOR'S CAPACITY TO MAKE WILL.

The question propounded to an expert, whether or not testator was in a condition to make such a will as good reason and a normal condition of mind would require, is incompetent. Whether or not testator had sufficient capacity to make a will, is a question altogether for the jury to determine.

6. CROSS-EXAMINATION AS TO CONCLUSIONS STATED IN AFFIDAVIT NOT PERMITTED, WHEN.

On cross-examination counsel will not, in a will contest, be permitted to read paragraphs from an affidavit made by witness in a former inde-pendent action to the effect that testator was not in good mental and physical condition, and then follow it up with the question, "Is that true?" when such questions are not being asked for the purpose of impeachment. The witness should have been asked the direct question bearing upon the subject-matter of the affidavits, that is, Was testator in feeble condition at such time, etc. Neither can such witness be asked whether he had not made a former statement that testator was crazy.

7. FAITHFULNESS OF BENEFICIARY TO TESTATOR COMPETENT EVIDENCE.

Evidence of the faithfulness of a beneficiary to testator is competent in a will contest, because one of the questions in such contests always is as to the reasonableness of the will, and whether it is such a one as would have been drawn by testator when in sound mind.

8. No Right to Cross-examine Witness as to Basis of Opinion until after Examination in Chief.

> Where a witness is called by defendant in a will contest to give his opinion in chief as to the mental capacity of testator, no right exists in favor of plaintiff to cross-examine him upon the facts and grounds upon which his opinion is based, until after the conclusion of the examination in chief.

Error to Huron common pleas court.

O. C. Pinney and A. V. Andrews, for plaintiffs in error.

Skiles, Green & Skiles and J. R. McKnight, for defendants in error:

Testamentary capacity. Page, Wills 114; 25 Am. & Eng. Enc. Law (1 ed.) 970; Redfield, Wills 129; Schouler, Wills (2 ed.) Sec. 68; 1 Schouler's Jarman, Wills (6 Am. ed.) 63; Thompson, Trial Evidence Par. 1121; *Pepple* v. *Pepple,* 7 Circ. Dec. 102 (13 R. 43); *Mears* v. *Mears,* 15 Ohio St. 90; *Haynes* v. *Haynes,* 33 Ohio St. 598 [31 Am. Rep. 579]; *Millen* v. *Young,* 8 Circ. Dec. 391 (18 R. 571); *Beresford* v. *Stanley,* 9 Dec. 134 (6 N. P. 38); *Kettemann* v. *Metzger,* 13-23 O. C. C. 61; *Kime* v. *Addlesperger,* 24 O. C. C. 397; *Rewell* v. *Warden,* 24 O. C. C. 344.

Declarations of one legatee not admissible against rights of other legatees. *Roush* v. *Wensel,* 8 Circ. Dec. 141 (15 R. 133); *Behrens* v. *Behrens,* 47 Ohio St. 323 [25 N. E. Rep. 209; 21 Am. St. Rep. 820].

Alleged errors in charge to jury. *Kuhl* v. *Reichert,* 25 O. C. C. 693.

Insanity, delusions, insane delusions. Thompson, Trial Evidence Par. 1122; *Edwards* v. *Davis,* 11 Re. 876 (30 Bull. 283); *Boardman* v. *Woodman,* 47 N. H. 120, 140; *Fraser* v. *Jennison,* 42 Mich. 206 [3 N. W. Rep. 882]; Dunham's Appeal, 27 Conn. 192; *Crum* v. *Thornley,* 47 Ill. 192; *Hall* v. *Hall,* 38 Ala. 131; *Cole, In re,* 49 Wis. 179 [5 N. W. Rep. 346]; *Potter* v. *Jones,* 20 Ore. 239 [25 Pac. Rep. 769; 12 L. R. A. 161]; *General Convention* v. *Crocker,* 4 Circ. Dec. 619 (7 R. 327); *Rapp* v. *Becker,* 26 O. C. C. 321; *Clark* v. *State,* 12 Ohio 483 [40 Am. Rep. 481].

## HULL, J.

This action was brought in the court below to contest the will of James A. Moore, late of this county who died in the year 1900. It was tried to the court and a jury, and the jury returned a verdict in favor of the defendants, finding that the paper writing in question was the will of James A. Moore. The motion for a new trial was overruled and judgment entered upon the verdict and it was to reverse this judgment that a petition in error was filed in this court.

Moore v. Caldwell.

The record is very voluminous containing some 1,500 pages. We have given it sufficient examination to familiarize ourselves with the testimony. We have specially examined the testimony of plaintiffs in error, the testimony of experts called by them and the testimony of other witnesses called by them. We have also examined the testimony offered by the defendants sufficiently to gather the full import thereof.

There was no substantial dispute in the argument of the case as to what the testimony was, that is, the general trend of it.

Several physicians were called by the plaintiffs and none, or but one on the part of the defendants, and he did not claim to be an expert on the subject of mental diseases. The evidence of experts upon hypothetical questions put to them by counsel for plaintiffs was, that in their judgment, at the time the will was made, James A. Moore was of unsound mind. Other witnesses who were not called as experts, testified substantially that in their judgment, from what they could observe, he was of unsound mind.

The defendants only called one physician, Doctor Garber, who had been Mr. Moore's physician in the latter months of his life. He testified that in his opinion, Mr. Moore was of sound mind at the time the will was made.

A large number of lay witnesses were called by the defendants,— some twenty or twenty-five, who had known Mr. Moore, many of them, for a great many years, fifteen, twenty, twenty-five and thirty years, and the most of them lived in the village of Plymouth where Mr. Moore resided for many years, and at the time of his death—and these witnesses testified in behalf of the defendants, stating the facts upon which they based their opinion—that in their judgment, Moore was of sound mind at and about the time the will was made.

An important question in the case, as in most will cases is as to whether or not the verdict was sustained by the evidence, or whether it was against the evidence.

The plaintiffs claim that Mr. Moore was of unsound mind and of insufficient capacity—mental capacity—to make a will at the time this paper was executed.

They also claim in their petition that the will was brought about by undue influence, but this was abandoned at the trial. It was probably not necessary to plead the ground upon which a will was asked to be set aside. The question is, whether it was the will of the testator, or not. But the claim as to undue influence was formally abandoned so that it left only the claim of mental incapacity, and that claim of the plaintiffs, according to the argument and the testimony in the

Huron County.

case, was based upon the claim that he was suffering, at the time he made the will and had been for some time prior thereto, from an insane delusion in regard to his wife who was living at the time the will was made, in 1900, but who died two or three days before Mr. Moore died, she having died on Saturday and Mr. Moore on the following Monday.

This alleged insane delusion concerning his wife, as claimed, was a false belief on his part, a belief not sustained by any facts, that she was guilty of unfaithfulness and of improper conduct with other men, —flirting with other men and conducting herself in an improper manner toward them, he believing that she was guilty of infidelity—and it is claimed that this influenced him in making his will to such an extent that the paper was not his will, but was the product of this delusion.

As I before stated, the first and most important question in the case is, whether the verdict was sustained by the evidence. We will not attempt to go into the testimony in detail.

The members of the household, a sister of Mr. Moore's wife and a niece, Nellie Wilcox, and some others testified to toward conduct on the part of Mr. Moore, showing these suspicions of his wife, or this belief that she was untrue to him, and various instances and circumstances are testified to tending to show things which it is claimed he said when men passed the house, or when men and boys came to the house; many instances are testified to by witnesses tending to show that he had these suspicions of his wife.

He gave his wife, by the will, the use of all his real estate during her life, so long as she remained his widow—all the real estate except eighty acres of land that he gave to William Caldwell, there being some two hundred and forty acres all together—and besides that he gave her the use of several thousand dollars worth of personal property, some of it being in money, the proceeds of life insurance policies, so that she could use it, if necessary, during her life; and he gave her the use of the residence in Plymouth, the household furniture and everything except a few special bequests to others. He gave to William Caldwell, the man who had been employed by him upon his farm about ten years, eighty acres of land absolutely, he to select that eighty acres from the two hundred and forty; and he made other special bequests—quite a number of them disposing of china, stocks, personal property of various kinds, jewelry, etc.

Mr. Moore was an eccentric man and had been to some extent for many years, perhaps all his life. His business was that of an insurance adjuster who traveled about over the state. He had accumulated prop-

Moore v. Caldwell.

erty, at the time of his death, to the amount of about $21,000. He came in contact with a great many people as an insurance adjuster.

As I have already stated, some twenty or twenty-five witnesses were called in behalf of the defendants upon this question of his mental capacity,—many old acquaintances, men who had done business with him for twenty-five years, some even longer than that, and some who had known him all their lives,—who testified to his conduct with them, his transactions and relations with them, and basing their opinions upon the facts, as stated by them, they testified that, in their judgment, at the time the will was made and prior thereto, he was of sound mind. He was irritable, as testified to by many witnesses on both sides and peculiar, and sometimes seemed to be under the impression that he was liable to get poor, and might go to the poorhouse. That is a feeling which some people have as they grow old who are not insane or of unsound mind.

He had three strokes of paralysis, or rather apoplectic strokes. The last one was about a year and a half before the will was made and from that he never recovered physically and perhaps, in fact, he never did have the strength of mind that he had had before. His mental powers were somewhat weakened by this stroke or by these strokes; there is no question about that. He was not as quick mentally as he had been before; but he continued to do business to some extent and to act for the insurance companies for quite a time after these strokes, but finally, on account of his infirmities he was "laid off," as it was said, upon a salary of $100 per month, where formerly he had been getting $300 per month. It was after this stroke or these strokes, when his powers of body and mind had been somewhat impaired, and his earning capacity had been lessened, only earning $100 per month where he had been earning $300 per month, and it appeared as though his time for accumulating property had passed,—I say it was then—that this feeling on his part, that he might get poor some time, or go to the poorhouse, especially manifested itself; and it is said that from being very careful and particular in his dress, he became careless as to what he wore. It may be said of that, that he, having reached this condition in health and being of this peculiar temperament, it might have occurred to him that there was a probability of his becoming poor before his death, and being in this state of health, he naturally would not be so particular as to his dress and things of that character, as he was before.

We shall not undertake to go into the testimony upon that subject in detail. These changes were noticed in him, but he continued to meet his friends and acquaintances and to do business with them, paid all his

bills by checks and so far as disclosed by the record, never made an error in a check that he issued.

He was sometimes very irritable, almost violent perhaps, and became very angry at his niece, Nellie Wilcox, finally ordering her out of the house. He disapproved, it seems, of a young man who showed her attentions about that time.

The will was made in March, 1890, and was drawn by Hon. W. W. Skiles, an attorney of Shelby, who had known Mr. Moore for some time but was not very intimately acquainted with him. Moore came to Skiles's office and told him how he wanted to dispose of his propery. He seemed to remember his property fully—the various pieces of his property. He had stock and other personal property and he remembered his relatives and his friends to whom he wished to give his property. He made some slight errors in the names of some of his relatives.

The will was drawn up without any suggestion on the part of anyone except by Mr. Moore himself. It was dictated to a stenographer in his presence and then drawn off on a typewriter and read to him again, and he pronounced himself satisfied with it in every respect, and he thereupon executed it, signed it, and it was witnessed.

Taking all the testimony together,—I have not undertaken to discuss or refer to all of it—it is our judgment that the finding of the jury in favor of this will was not and cannot be said to be against the weight of the evidence.

It is said that the testimony of the defendants did not reach the real issue in the case, whether he was possessed of this delusion as to his wife; but after all, the question in the case was whether he had mental capacity to make this will, and although he may have had this belief as to his wife, even if it was unfounded, unless it was an insane delusion, it would not constitute mental incapacity, and the jury were warranted in finding from this evidence, whatever there was of that, that it did not constitute an insane or fixed delusion.

He may have been mistaken about it. There is no evidence here that his wife was not a pure woman. He may have been led to believe these things from some things he had seen or heard or suspicioned and his belief based upon these things. He may have been entirely mistaken about it as he undoubtedly was, and yet, not insane or suffering from delusion; and the jury may have found and properly so that, whatever this belief was, it did not influence him in making this will, or influence him in the provisions that were made for his wife.

She was his second wife. He had been married once before. He had no children by her. There had been a good deal of trouble. She

Moore v. Caldwell.

had twice brought suit against him, once for alimony and once for divorce and alimony and he had been bitter toward her.

It was a natural desire on his part that his property, which he had accumulated himself, in the end, should go to the members of his own family; but when he came to make his will, he gave her a life estate of the property, of the real estate, and the personal property as far as it was necessary for her to use it for her maintenance and support. He provided for her quite bountifully under all the circumstances, giving her the use of 160 acres of land and the use of this personal property and the home in Plymouth so long as she remained his widow, besides leaving $3,000 in life insurance.

It was not an unnatural desire on his part that the property which he had accumulated should not go to the benefit of some man that she might thereafter marry. So we say, taking all these things into consideration, the fact that he had had these troubles with his wife and all these things that I have mentioned, the jury would be warranted in finding that, whatever his belief or suspicion was as to his wife, whether founded or unfounded, it did not influence him in making this will to such an extent that it should be set aside, on that ground; and the testimony of all these people who had known Moore this great length of time and had been so intimate with him, was, that in their judgment, he was perfectly sane and competent to transact business. That testimony must be considered also upon the question of this alleged delusion which it is said he had.

All the testimony that was offered upon the subject of his mental capacity both by the defendants and by the plaintiffs, must be considered in determining whether or not at the time he made this will, he was of sound mind and whether he was suffering from any insane delusion that induced him to make and sign a paper that was not in fact his will.

No medical experts were called by the defendants, the defendants' witness, Doctor Garber, making no claim to be an expert. The testimony of experts goes to the jury to be considered by them as any other testimony, and although the defendants had no experts, it cannot be said that the testimony of the expert witnesses called by the plaintiff should outweigh absolutely the testimony of the lay witnesses called by the defendants; in fact, the testimony of lay witnesses, of sound common sense, practical business men and neighbors who saw this man from day to day on the streets, in their houses and in all the walks of life, who talked with him and observed his conduct, in our judgment, is entitled to as great consideration as the testimony of experts who

never saw him and knew nothing of him except as stated in hypothetical questions.

As is often said in the books, it is not necessary for a man to make a will to be as strong in mind and body as he ever was; in fact, as is often said, it is not necessary for him to have that strength of mind required in making a contract; but he must have sufficient mental capacity to remember his property and the proper objects of his bounty, and without suggestion, to make a testamentary disposition of it.

It seems to us that Colonel Moore clearly had such mental capacity at the time he made this will.

Mr. Skiles who drew the will who is now dead but whose testimony is in the record, was not intimate with him; was not familiar with his property or with Mr. Moore's relatives; so, without suggestion, as I have said, from Mr. Skiles or any one else, Mr. Moore gave to Mr. Skiles who drew the will, all of its details.

He had said to many or to some at least, before the will was made, how he intended to dispose of his property to some extent: that he did not intend to give any of his property to Nellie Wilcox. He had said to many that he intended to reward liberally William Caldwell who had been a trusted and tried friend and a faithful employe on his farm. He told others, after the will was made, that he had given property to Caldwell and none to Nellie Wilcox and he told others that he had given a ring mentioned in the will to a man in Dayton and why he gave it. In speaking of Nellie Wilcox, he stated why he gave her nothing. He had evidently planned and purposed this will, before it was drawn and knew what disposition he had made of his property in the will and stated it to others, showing that he understood what he had done.

It was a question for the jury under this evidence, whether the testator had sufficient capacity to make a will at the time it was made and an investigation of this kind usually takes in, as in this case, his whole life, and the jury considering all the testimony, find whether or not the paper is his will, and we think in this case that the finding of the jury was unquestionably correct.

It is complained by plaintiffs in error that they were not given the right to cross-examine lay witnesses called by the defendants before they gave their opinions as to Colonel Moore's mental capacity; that is, they were not permitted to cross-examine them upon the facts and grounds upon which they based their opinion, but the court permitted counsel for defendants to examine the witnesses in full and to ask their opinions as to Moore's mental condition and then they were turned over

Moore v. Caldwell.

to counsel for plaintiffs for cross-examination. In this, we think there was no error.

Some authorities are cited by plaintiffs in error tending to support their proposition; but we think the great weight of authority is against it and the best reasoning is against it. It is not only in cases where mental capacity is involved but there are many cases of opinion, evidence and matters of reputation.

We have never, in practice, known of a party being permitted as a matter of right to cross-examine along this line, before a witness has finished his testimony in chief. In matters of value, opinions are often asked and when the foundation is laid an opinion is permitted to be given and then the other side is permitted to cross-examine the witness.

We think it would lead to confusion and an. undue prolongation of a trial to permit a cross-examination of this character, of witnesses of this kind.

Where there is a question as to the competency of a witness or whether the matter is privileged, such as the evidence of a physician, or a lawyer or priest, or whether a conversation occurred between husband and wife in the presence of third parties, cross-examination is permitted before the testimony of such a witness upon the real question is admitted. But it has never been the practice, to our knowledge, to permit this where an opinion is about to be offered, as in cases of this character.

There is a long line of exceptions in the record on this point. It is claimed that, in one or two instances, lay witnesses were permitted to give their opinion as to Mr. Moore's soundness or unsoundness of mind without stating the facts upon which they based that opinion. Pages 572 and 730 of the record are referred to, but upon examination, we think those witnesses very largely stated the facts before they were asked to give their opinion based upon those facts. But there were interruptions due to objections and arguments and finally the question was renewed simply by asking the witnesses to state his opinion but it was understood, of course, that the opinion was based upon the facts already stated and there was no error in the action of the court.

Testimony as to the faithfulness and fidelity of William Caldwell to the testator was objected to and admitted over the objections. In our judgment, this was proper testimony in this case, as will cases are tried. This is the question always, as bearing upon the validity of the instrument. Is the will reasonable; was it such a will as the testator would have drawn had he been in sound mind? Caldwell was one of the main beneficiaries under the will, and it was proper to account for this that

it might not appear unreasonable and a fraud. The will itself now, as in Hamlet's time, is to a great extent "the thing."

As I have said, Caldwell was given eighty acres of land and it was sought to show his relations with Colonel Moore—that Colonel Moore liked him; that Caldwell had been faithful to him upon the farm and in all their relations, etc.,—as bearing upon the reasonableness of the will and the condition of Mr. Moore's mind at the time the will was made. In our judgment, this testimony was admissible. If Caldwell had been an enemy or an entire stranger to Moore, and no reason had existed why he should give him any of his property, it would have been perfectly proper for the plaintiffs to have shown these things and we think this testimony in behalf of the defendants to sustain the will was entirely admissible.

A question put to Doctor Van Norman by plaintiffs in his deposition was ruled out. It appears on page 89 of the record. We think it was properly excluded. The question was asked Doctor Van Norman, whether in his judgment Colonel Moore was in a condition to make such a will as good reason and a normal condition of mind required. A long hypothetical question is put to him which cites many facts and he was asked this question, as I have stated.

In our judgment, it was not proper to ask the doctor whether Moore was in a condition to make such a will as good reason and a normal condition of mind required. It came too near asking the witness whether in his judgment, Colonel Moore was competent to make this will, which was a question for the jury.

William Caldwell was placed upon the witness stand by the plaintiffs for cross-examination and was the first witness called in the case. It appears from the record that in one of the alimony cases brought by Mrs. Moore against her husband, affidavits had been filed on the part of Colonel Moore to the effect that he was not in good mental and physical condition for the purpose of showing that he was not capable of earning money, and among these affidavits was that of Caldwell, and counsel for plaintiffs read to Caldwell paragraphs from his affidavit, he being then on the witness stand for the purpose of cross-examination, and asked him whether that was true, or whether he made affidavit to that and he said he did; then he was asked whether that was true. This was excluded. He was asked many questions along that line and finally counsel for plaintiffs asked Caldwell the direct questions bearing upon the subject-matter of the affidavit. Was he in feeble mental condition at such time, etc., and those questions were permitted to be answered by the court.

Moore v. Caldwell.

We are of the opinion that all the plaintiffs were entitled to, was finally admitted by the court; we are of the opinion that it was not proper to ask this witness if he did not say that in his affidavit—if he did not say such and such things in his affidavit—and then follow it up with the question, "Is that true?" He was not being asked these questions for the purpose of impeachment; he had not yet been upon the witness stand and it added nothing to the testimony, that he had made affidavit upon these subjects. The question was not whether the things he made affidavit to, were true or not, but he could be asked the direct question as to the facts, which was asked by counsel and the testimony admitted by the court.

As I have already stated, all that counsel was entitled to, Caldwell answered, of these questions and he did not attempt to dodge, as far as we can discover, the effect of the testimony. He seems to have been a frank witness. We think there was no error in refusing to permit the examination upon the affidavit.

Then Caldwell was asked whether he had not made a statement to a man by the name of Waite, that Moore was crazy, and this was refused by the court, and we think properly so. He was not on the stand for the purpose of impeachment.

There were other beneficiaries under the will and Caldwell's declarations out of court could not bind other legatees or devisees under the will, and that class of testimony, it has been held, is not admissible in will contests. The question was before this court in *Roush* v. *Wensel*, 8 Circ. Dec. 141 (15 R. 133) and discussed in the opinion delivered by Judge Parker.

Wills cannot be set aside by the admissions of different beneficiaries under the will. There might be legatees with only a small interest, and it is very clear that it would be improper to admit their declarations out of court against another beneficiary under the will who might have a much larger interest. Of course, a man's interest does not affect a rule of law, and I only speak of this to show what the admission of such testimony might lead to. We think the action of the court was correct.

There are some other questions made upon the admission and exclusion of evidence which we shall not especially refer to. In our judgment, there were no prejudicial errors committed by the court in the admission or exclusion of evidence during the trial of the case, which extended over a period of some fifteen days. No exceptions were taken to the charge. The judgment of the court of common pleas will be affirmed.

**Parker** and **Haynes, JJ.,** concur.